Franklin v. Regions Bank Ms. Cheddar. Yes, Your Honor. Good morning. Good morning, Your Honors, and may it please the Court. My name is Chloe Cheddar, and I am proud to represent the three appellant to manage all aspects of their financial lives. Regions handled their banking, Regions handled their investments, and Regions handled their property assets. And here, Regions was paid handsomely and profited handsomely off these women, making more than a million dollars for just the transactions at issue in this case, whereas the women were left in no better position than if they had never hired Regions at all. The District Court's decision in favor of Regions should be reversed and remanded for three overarching clear errors. First, the District Court's enforcing Regions' form exculpatory clause. Second, the District Court's damages analysis. And third, the District Court's finding that Ms. Boney had no implied in fact contract with Regions. Starting with the exculpatory clause, Regions has a limitation of liability, a release in its form agency agreement that says the bank shall never be liable or responsible for any loss, damage, or injury sustained by reason or account of any mistake in judgment. It only excuses mistakes in judgment. And here, the District Court incorrectly interpreted that contract, incorrectly interpreted the phrase mistake in judgment. Taking a look at that phrase in the contract itself, taking a look at that phrase in the case law, it's clear that a mistake in judgment is when a person makes a considered decision between reasonable alternatives that in hindsight turns out to be not the best or wisest course, but it was nonetheless reasonable at the time. For example, the Louisiana Supreme Court says that in Smith v. Marquette Casualty Co., it says a mistake in judgment happens so long as someone exercises reasonable care or prudence considering the circumstances. Regions does not address Smith v. Marquette in its brief, and importantly, Regions doesn't offer an alternative definition. Regions takes issue with relying on cases like from the Supreme Court, from this rule, because they don't involve a form exculpatory clause. I don't think that matters, because what we're looking at is what the plain and ordinary meaning of the words are, and that shouldn't be changing. I mean, I'll be honest with you, I struggle with this because there's no doubt that there was a mistake made here, but we're talking about Mr. Moore's mistake in the extent of the lease extension, is that right? Correct. So there's no doubt there was a mistake, and I mean, to my eye, a pretty big one. I don't remember how the Louisiana Supreme Court characterized it, but it's not a small mistake. The question is, is it a mistake in judgment, which is what you're getting at, and I mean, help me with, to try to characterize the mistake according to your argument that shows this is not a mistake in judgment, this is some other kind of mistake. To make a mistake in judgment, you'd have to have exercised judgment at all, which didn't happen here. There was no consideration between one reasonable alternative and another. According to the court, and we accept these facts as true, he simply failed to comprehend a one-page document. So it wasn't a scenario where, you know, there's an alternative lease on the table that's maybe for longer, maybe the price is a little lower, and he chose this one instead of that one. He didn't understand the document, and the district court agreed that his conduct was negligent, so by finding his conduct to be negligent, it cannot be a mistake in judgment, because negligence by definition is a deviation from reasonableness, and a mistake in judgment requires exercising reasonableness under the circumstances. So what Regence is going to say is, well, he negotiated this lease, he talked on the phone, they exchanged correspondence, none of that matters. It's a little bit like saying when you get in your car in the morning, you check to make sure your blinkers are working, you check to make sure your brake lights are not stopping. It doesn't make a difference if your brake lights are working if you never hit the brakes. So here, all the negotiation, all the lead up to the lease extension, only underscores how grossly negligent his failure to comprehend was, because he didn't ascertain that the things he had negotiated for actually ended up in the document. Can you, so this is with respect to a document, you say a one-page document, a lease extension. He, as I understand it, he thought that it was only for the, what is it, the 168 acres? Yes, Your Honor. But instead it turns out it was found to be for 1,800 acres. Correct. Can you point to where in the document, I mean, I'm trying to imagine what happened here. I'm reading the document and I misread part of it, I missed part of it. What is it? I'm just trying to get at how this error could have come about. So in the lease extension, the way the error occurred is Mr. John Moore himself testifies that he essentially just depended on what his matador had told him. He said it's a form document, it's extremely straightforward, it's clear, it only extends the term of the lease, and he just trusted what his as Your Honor knows is just simply wrong as a matter of law. If you're going to sign a document, you need to understand what it says. So you're saying he failed to read the acreage and the depth provisions of this document. So the lease extension itself doesn't actually contain any acreage or depth provisions in the document. So it only changes, it's really just one paragraph of the lease extension. It's two sentences, one paragraph, and directly underneath that paragraph it says all other terms remain unchanged. So the real fault comes in having negotiated for a higher price, having negotiated that it's only going to extend the lease for the 168. He did nothing to found, this is really undisputed in the record as well, that matador, the opponent in the lease transaction, sends him a copy of the form lease extension that they want to use before they ever start negotiating the terms. Then they negotiate the terms. Regions will say there's lots of phone calls, there's correspondence, they met, and then they send him back the exact same form document except all they did was change the term. Change it from... You're saying he should have put in the document the size of the acreage, the 168 versus the 8. Correct. All the testimony from him, from other regions representatives said that would have been very easy to do and he did not do it. And so that wasn't a mistake in judgment not to include that? Correct. Good judgment says put it in there. Correct. Especially someone who is a certified professional landman, a certified landowner, and that didn't happen. But if he makes a mistake... That contains the limitation or reduction? The correspondence between the parties refers to the undeveloped 168.95 acres. So a little bit like parole evidence, right? There is information that refers to 168.95 acres including the checks that the women received as a result of the lease extension because the lease bonus price was supposed to be $100 per acre and they were only paid for the 169 point or 168.95 acres. By the bank, by regents. Exactly. So, exactly. It's... The district court found that he read the document and simply failed to comprehend what it said. There is no case, there are no facts that would suggest that that is a mistake in judgment. You're telling me it doesn't say anything about acreage? Correct. And that's what should have been in it? Correct. According to you? Correct. So I guess my question is then how is it just not a mistake in judgment that he didn't include the acreage? Because even if that were to be the distinction, again a mistake in judgment needs to be a decision between two reasonable alternatives. You had two alternatives. One was to include it, the other was not to include it. One of those is extremely unreasonable. So that wouldn't be a mistake in judgment. That would again be grossly negligent. Let's assume it is a mistake in judgment. Isn't it true, I thought your argument was also that under Louisiana law you cannot exculpate gross negligence. That's true. So let's assume it's a mistake in judgment along the lines of what Judge Graves is saying. It was a mistake in judgment not to have the acreage spelled out more clearly in the lease. That's a mistake in judgment. Tell me your argument on, let's say let's say we disagree with you on that point. It's a mistake in judgment, but if it's grossly negligent it doesn't matter because that exculpation provision is not, doesn't work under Louisiana law. Your honor is exactly right. Article 2004 of the Louisiana Civil Code says that any release or waiver limitation of liability that excuses gross, preemptively excuses gross fault is absolutely null. It's void as a matter of public policy in Louisiana. Article 2004 says you take it out. You take that provision out of the contract. What are we reviewing here with respect to gross negligence? In other words, are we reviewing a factual finding by the district court that this was not grossly negligent or what are we reviewing? Correct. So that we don't dispute the definition of gross negligence. You know, careless disregard, reckless indifference, all the want of care, lack of elementary prudence, right? So here, that's where the Louisiana Supreme Court decision comes in the most. The Louisiana Supreme Court specifically says that this was an inexcusable lack of elementary prudence or simple diligence. That matches exactly the definition of gross fault. I'm not arguing res judicata. I said it in my original brief. I said it in my reply brief. I'm saying it now. What I'm asking is the court sitting in diversity has to put itself in the shoes of the Louisiana Supreme Court. What would the Louisiana Supreme Court decide on these facts? Interestingly enough, the Louisiana Supreme Court has already decided these facts and found that these facts were an inexcusable lack of elementary prudence or simple diligence. That's gross fault. So to excuse his behavior as a mistake in judgment is excusing gross fault which Louisiana law does not allow. Turning very quickly to the Do you mean to say gross negligence or do you mean to say gross fault? So article 2004 uses the phrase gross fault. The case law says gross fault is gross negligence and I think that's the point is that fault falls on a spectrum from ordinary negligence all the way to intentional purposeful malicious misconduct. That spectrum of fault applies in lots of cases, tort cases, contract cases, and comes up in a variety of circumstances. So I don't think it makes a difference that the whether an exculpatory clause applies or does not apply. It doesn't matter if what the Supreme Court said was these facts equal gross fault because these facts are an inexcusable lack of elementary prudence or simple diligence and the definition of gross fault under Louisiana law is the lack of slight care and diligence, disregard of the dictates of prudence. Those are the same thing. Addressing quickly the damages, before I get up for rebuttal, all I'd ask is that your my opponent to cite the record the page of the district court's decision where he resolves the royalty issue because it is simply not there. Not a site to the to the competing positions, not a site to the to the trial testimony, a site where the district court resolves the royalty issue because it is simply not there. On the lease bonus payments, the district court said you know but for this cloudy title they would have unquestionably accepted an 8750 lease bonus offer in May that is in fact not what happened. So Regions did not accept the lease bonus offer in May, it submitted a counter offer. For a valid lease to exist you have to agree on price, thing and term. Here there was no agreement on thing or price because Regions changed those terms of the contract and sent it back. Also addressing very briefly your honors, Ms. Boney's implied in fact contract, the district court erred in its view of the circumstances. Under Louisiana law you can consent to a contractual arrangement by action under the circumstances. This court has said you look at what the offeror would have understood, what a reasonable person in the offeror's shoes would believe to be happening. Here... What do you contend with the terms of this implied contract? So what Ms. Boney, what she had, her course of conduct with Regions was that they would give her advice as to mineral leases. She simply retained the right to sign the documents for herself. So the way that I analogize it, it's a little bit like the difference between a discretionary and a non-discretionary financial advisor. If you give someone full discretion they can do things totally on your behalf. You don't need to be there to approve it. They can make those trades entirely for you. In a non-discretionary situation you depend on an advisor for advice, for their thoughts on what someone in your shoes should be doing, what's reasonable for you, what makes sense financially for you, but then you make the trade yourself. And that's what's happening here is Regions is telling her, here's a lease. We negotiated the terms. That's the term of her contract with them. Correct. That's the term that you claim was breached by Regions? Correct. Because under Louisiana law all contracts are subject to the inherent duty of good faith and again here it's not in good faith to have engaged in grossly negligent conduct by failing to understand a one-page lease and then telling her to sign it because it's in her best interest. It's absolutely not in her best interest. So because the district court erred both in its analysis of mistaken judgment, in its analysis of the damages, and in its analysis of Ms. Bonny's contract, I'd ask that this court reverse. May it please the court. Justin O'Brien on behalf of Regions Bank. Heard counsel say a lot of things. You heard her talk about mistake. We've heard her talk about everything, but it's her opening sentence that's probably the most controlling in this case. The cornerstone of any appeal is the standard of review controls the outcome and here that standard of review is clear error. Each and every challenge that appellants raised, she said there were three of them, all reviewed for clear error, is to a factual finding by the trial court reviewed for clear error. A standard appellant can't meet. They can't meet it because there were competing witnesses. This isn't a factual finding. It's a legal conclusion. What is meant by gross negligence and do these facts meet that definition? The Louisiana law and the court sitting in diversity says a finding of negligence or gross negligence is a factual determination this court reviews for clear error. Now I'll talk about mistaken judgment if we want to talk about that being de novo, but I do believe the standard here is clear error. That's what she said. That's what they briefed. So going forward and I'll come back to the issue of whether or not it was a mistaken judgment because it's pretty clear it is. As far as the royalties claim, they keep saying point to it in the judgment. I don't have to point to it in the judgment. The judgment itself is not the reasons for rulings and factual findings. The judgment is a single document. All of the appellant's claims were dismissed. They received nothing. This court has clearly said we appeal judgments not the reasons for ruling and the judgment says they take nothing. That's a denial of all claims. The reasons for ruling go through and discuss. Regions expert Mr. Fuller says they are entitled to no damages. In fact, they got more in the way of royalties under the lease extension than they would have gotten under the petrohawk. That's his testimony. That's discussed in the reasons for ruling. I can't remember if it's in the factual findings or conclusions of law. It's discussed and it's determined. Clearly, if plaintiffs are asking for six and defendants are saying zero and the court awards zero, that's the determination. What they're asking this court to do is remand for the trial court to go back and give written reasons on the royalty issue. The testimony is in the record. Mr. Fuller was quite clear they were not entitled to any damages for royalties because he did the discussed it in detail. The fact that the trial court didn't list all of the four days of trial testimony in its reasons for ruling does not mean that that's not what happened. Quite clearly, the royalties claim was dismissed. They received nothing. Plus, there is no appellate rule that requires the district court to address every single claim the appellants did. You don't have to get there in this case because you can just look at causation. The trial court's ruling looked at the issue of causation. Causation would resolve the entire thing. What the court said is that in May, when Regents received this offer, it was a spreadsheet. There were many properties. Regents made a counteroffer because it was aware of this extension. What the trial court says, if there's no lease extension and for the properties that there was no lease extension, Regents accepted them, 8,750 an acre. Appellants received that money. That's what the trial court's causation is. Causation, you have to show causation with a breach of contract to get the damages. They can't show causation. Causation under Louisiana law is for clear error. You have the simple facts of what went on. Let's turn to Ms. Bonnier. I heard today that they're not talking anymore about an oral contract. They're saying it's a contract implied, in fact. It can't be any of those. That's when you look at the fact. Judge Graves, you said, what was the contract? Opposing counsel said they would provide her advice and she would retain the ability to make the decision to sign or not. It's much like hiring a compensated financial advisor. I added compensated. She said financial advisor. Very interesting in there. There's no mention anywhere of what Regents gets out of this contract. Regents isn't getting paid. Ms. Franklin, Ms. Piranay, they're paying Regents. Ms. Bonnier isn't. Here's why. The facts bear this out. 2001, one lady has a mineral management agreement. There's no mineral transactions. 2001, none. 2002, 2003, that's what Mr. Hand testified to. In 2004, there's negotiations with Matador and Prestige. Mr. Hand looks at the file and says, I've got one, but I don't have them all. So what does he do? He gets a second lady to sign. But there's no testimony he ever asked Ms. Bonnier to sign. Ms. Franklin signed a mineral management. Ms. Piranay signed a mineral management. Ms. Bonnier didn't. But you have to look through all of this where she says she's relying upon this advice. It's not the advice to her. It's the notes say it. Ms. Bonnier would do whatever the other two did. She wasn't relying upon the advice of Regents to her. She was relying upon that Ms. Franklin and Ms. Piranay had looked at the advice from Regents and agreed to do it themselves. That's no advice from Regents. There was at the trial court a lot of discussion about different facts, but none of it mattered because they don't adhere. What she's trying to say, it's implied in fact. But it's not. And even if it is implied in fact, that's a factual conclusion. But here, even if you look at all the rest of it, turn to the 2007 lease extension. And the key witness here is Ms. Bonnier herself and Mr. Mouton. Ms. Bonnier said, well, I got the advice from Regents, but only talked to three people at the time. Carol Rushton came on the stand and said, I didn't give her advice on mineral management contracts. I never did. It's outside my area of competence. Well, you're concentrating on Ms. Bonnier, or however you pronounce that. Get back to the two fries. Okay. Putting aside Ms. Bonnier, Ms. Franklin, Ms. Frye, they have a contract. You turn to that contract. That contract clause, they take two positions. One is it requires a mistaken judgment or it's gross negligence. Well, Judge, look at that contract. It says a mistaken judgment. Trial court briefing. The only thing cited by appellants regarding mistaken judgment is the Cambridge-Oxford Dictionary. They complain, hey, trial court looked at Black's Law Dictionary. Well, Black's Law Dictionary gives a decision. And Judge Duncan, I think we agree. It's clearly a mistake. I confess that all these definitions of mistaken judgment really don't help me very much. The definitions are basically, well, a mistake means you did something wrong, and judgment means you exercise judgment. That's okay. That's not helpful. But do you agree that, let's assume that Mr. Moore's mistake here with respect to the gross negligence? Article, Civil Code Article 2004, it's clear, Judge. You can't. Okay. So here's what the, I mean, tell me if I'm wrong. Here's what the Louisiana Supreme Court said. I think they're talking about Mr. Moore at page 814 of the Peronet versus Manador Resources. Can I get my book, Judge? Sure. I mean, if it's okay with Judge Grace. Sorry. Right. So, I mean, I'm, this language is cited in the briefs. The court says at page 814, we find, as did the district court, reasonable persons could not disagree. The alleged error on the part of the plaintiff's agents in this case, and that includes Mr. Moore, I think, was easily detectable and could have been rectified by a minimal amount of care, i.e., by simply reading the document and or by requesting simple changes to the written offer before acceptance. Now, you can tell me whether that language is applicable to the error that I'm describing. If that's how the Louisiana Supreme Court is describing the error, why isn't that gross negligence? Okay, Judge. Case before the Louisiana Supreme Court was mutual error under Civil Code Article 1959. That's right. Okay. And that, in that case, you have to look at what the proof was at the trial court. You're trying to prove mutual error. So mutual error, plaintiff comes in, says, hey, I didn't understand the contract. It's different than what I thought it was going to be. Defendant comes in and says, contract's plain and clear. Burden shifts back to the plaintiff to show the error is excusable neglect. We got McClude neglect. That's our mistake. So the issue in the trial court, which was to a jury, says it has to be excusable neglect. In other words, you made a mistake, but we're going to let you out of it. There's nothing in those cases under 1959 that come anywhere near gross negligence. They don't talk about gross negligence. They talk about excusable neglect. Y'all made a mistake. We're going to let you out of it. We're going to rescind this contract or we're going to reform the contract. It's real easy if you and I are in a contract and we both make the same mistake. Say, no, we didn't want to sell a Toyota. We wanted to sell a Lexus. Easy, mutual error. That's the issue that went to the court. So what was the issue? The issue was the intent of the appellants was, my intent was 168.95 acres. Matador comes in and says, no, our intent was everything. Jury says, we agree with Matador. Right. We don't. So there's no mutual mistake or whatever. That's what the jury thought. Second Circuit says, no, wait a minute. We disagree. We find it to be excusable neglect. So now the Louisiana Supreme Court comes back and says, okay, it's not excusable neglect. There's not a single case and there's no authority that says not excusable neglect equals gross negligence. So I get it. I get a different issue. Fair enough. Fair enough. But I guess address head on that you say it's a factual issue. Maybe it is, maybe not. Maybe it's a mixed question of law and fact. Who knows? But address why is what Mr. Moore did here the mistake he made not rise to the level of gross negligence? Here's why. First point. You have a contract. He misread it. Okay. The negotiations went on for a period of time. I think it was six or eight months. Four or five or six in-person meetings, documents back and forth. So the judge looked at that correspondence. He looked at the map. Matador sent a map of the whole property and just 168.95 were indicated. So what John Moore did is he looked at it. He said, based upon the correspondence from Mr. Mouton represent Prestige slash Matador, you want to extend the 168.95 acres. Boom, boom, boom, boom. Okay. The document doesn't agree with all the correspondence in the maps. I think we're all in agreement with that. So John Moore looks at it and his judgment, he says, based upon all of this communications and everything we did, I think this is extending the 168. He made a judgment call. And how do you know it's a judgment call? You know it's a judgment call because every day in this country somebody walks into court and says, judge, we've got a contract dispute. We don't understand. We disagree on what it means. Will you render a judgment and tell us what you think it means? Read this contract and exercise your judgment to tell us what it means. That's a mistaken judgment. Here's why it can't be gross negligence. One, there's not a single case that supports that claim. They didn't cite a single one that supports that theory. And you've already taken away five minutes of my argument dealing with why those cases don't apply, judge. But you turn around, it's a mistaken judgment. How is it gross negligence? Here's why it's not gross negligence. Because no court has once said that it is. There's not a single one that says that. Two, the Supreme Court opinion in Pyrenees says he didn't read the contract. Evidence in our trial put on by a different attorney with different witnesses said, oh, yes, he did. So there's a big factual difference there. And you just have to come down and say, without any of that information saying it's gross negligence, how do you get there? Because the Fifth Circuit, at least in orthopedics, sports and injury, and the Euston case have both said mere inadvertence or mistake are not gross negligence. And that's what you have here. John Moore signed a contract that he said one thing. He thought it said something else. And here's why it can't be gross negligence. Because if it is, every attorney in the state's in trouble. Because if you misread a contract or misdraft a contract, therefore it's gross negligence. Therefore, you're malpracticing. I agree with you. Gross negligence is a much higher standard than So let me understand. What is it that he misunderstood so that I could understand? Okay. Yeah, I get it. Yeah. He misunderstood this. But, you know, it's a mistake, but it's not this. Judge, what his testimony was. He was not available for trial. So it's through depositions. Says, I thought it was for 168.95 acres. And it wasn't. Okay. The second part here is the deep rights. And there's testimony in the record that said deep rights had little to no value at that time. So in order to get through the gross negligence standard under 2004, he has to either have an intent, which he didn't. There was no intent by Mr. Moore to harm these ladies. Okay. I don't think anybody's gonna say that there was. But you also have to say that the guys come in and this lottery, as Dr. Loren Scott comes where lease bonuses go through the roof, he has no ability to predict that this is going to harm these ladies in this amount. So they don't meet that portion of gross negligence either. They just can't get there on the elements they have to have for gross negligence because there's no foreseeability of harm. So even if you find, well, it was pretty bad. There's no intent. There's no malice. Couldn't anticipate Haynesville Shale. And here's what we know. If we were, so if this was before the boom in the Haynesville Shale. Right. Right. This was before. If this had happened during or after the boom, would it be gross negligence? I know that's a hypothetical, but. Well, Judge, if everybody else, let's talk about the Haynesville Shale boom. Okay. May, you saw this lease extension. They were fighting over whether it was going to be $33 or $50 an acre. Right. Right. Okay. Now here we are in May and it's $8,750 an acre. I mean, you're going from getting a royalty check of $2,000 to getting one of $3 million. I mean, it's hitting the lottery. I mean, if that check hits me, I'm not standing here anymore. I'm retired. Okay. They hit the lottery. No way to predict it. It comes in. If everybody else is getting $8,750 and you know it, it might be a much harder call for me to stand up here and defend. But the point is, Regents got a spreadsheet, $8,750. We've carved this one out for this trial. All the others were accepted. That's the evidence at trial. So without this lease extension, without the people from Regents saying, wait a minute, PetroHawk, we got this thing hanging out there. Let's come back to it. You don't even get there. $8,750, Dr. Lawrence got testified, was above market rate at that time. So what plaintiffs are really trying to do here is they're trying to time the market. And we all wish we knew what Microsoft and Apple were going to do when they first came out because we'd all bought it. They were at $100 an acre. They went to $1,000 an acre. They went to $8,750. Everybody Regents could took it at $8,750. The Regents had authority. The one we talked about, Mr. Hand testified about it. They got more. They didn't give Regents the authority to approve it. They didn't. They said, we'll gamble. They got $20,000 an acre. But that's because the individuals gambled. And here, Ms. Bonia, you find no contract, which I think you have to. She took it. That's pretty much where you end up. And all of that leads to the clearly erroneous standard. But even if you look at that clause and say you can't let out gross, all you do is strike the portion that relieves gross negligence. So I think this court, it's a mistake in judgment. I think Judge Graves said it probably the best. Mr. Moore's mistake was he didn't. In his judgment, he didn't put in a property description. He just assumed or made an error in his judgment thinking that's all it was. That's a mistake in judgment. You go to the exculpatory clause. It's not gross negligence. It lets you out. If you find it is gross negligence and you strike the clause, you only strike the gross negligence portion. But you still end up causation. You can't get past causation because at $87.50, ladies who were having to go to work for the first time in their life at their 50s, who were looking to sell the property because they needed money before this came in, they would have taken $87.50. These were people who needed the money. They were complaining because it was taking so long to get the lease extension done on $50 or $75 an acre for a check that's only $2,000. They clearly would have taken the money. Therefore, you fall out on causation. They're all clear error. They've acknowledged it's clear error. I'm out of time. Thank you, counsel. Mr. Cheddar, if Mr. Moore, if he knew the extension covered the full acreage and the deep rights, and then he decided to go through with the lease agreement anyway, knowing it covered the full acreage to $1,800, would you still have a claim? Yes, Your Honor, because the point was, Mr. Moore negotiated $100 per acre and only received $100 for 168 acres. $100, doing the math over the full acreage, these women got $7. No, but I'm saying if he knew it covered the full acreage and he signed it and it was for the full acreage and they got paid for the full acreage, you wouldn't have a claim. Just saying they didn't get paid for the full acreage. I think the deep rights would still be an issue, Your Honor, and the district court found the same. The district court found that it was a violation of the standard of care to have extended the lease for the entire acreage as well as to not have excised the deep rights because regions form contracts always excise the deep rights. There's a lot of testimony about that. They put that in every contract they have, and Mr. Moore didn't address it at all. What could he have done that was more gross negligence than what he did? Probably nothing, Your Honor. I think this is it. Just as Judge Duncan said, the Louisiana Supreme Court went through exactly what happened and said, this is an inexcusable lack of elementary prudent, simple diligence. The Louisiana Supreme Court outlined every step that regions could have taken to remedy this issue before it ever happened, none of which were accomplished. And I want to say, I think Your Honor is right. I don't dispute that on factual findings, this court reviews those for clear error, but the clear error standard after a bench trial also depends on the judge getting the law right. And a contractual interpretation is an issue of law for this court. Whether something as a matter of law is an acceptance or a counteroffer is a legal conclusion, not a factual one. I want to talk about Bonnie again. Again, under the Civil Code, you look at the totality of the circumstances. Here, as regions admit, their relationship starts in 1999, early 2000s. Ms. Bonnie was specifically recruited to regions because she co-owned this property with the other two women. She gets annual reviews from regions addressed to all three of them, explaining what regions is doing for all three of them. Those annual reviews include Mr. Joey Hand, who was the person who was handling their stuff before John Moore came into the that was later assigned to Matador. He admitted on the stand that he recommended Ms. Bonnie signed it. And regions counsel admitted in closing that Mr. Hand admitted that. That's at ROA 4418 and 19, and Hand's testimony is at ROA 3637. In 2005, Mr. Hand sends Ms. Bonnie a lease that he has prepared for her signature. He explains how she's going to get paid. He explains the terms of the I'm not your mineral manager. You need to find someone else to explain this to you. Have you ever paid regions? So, regions took a quarterly fee from her bank account of, I think the testimony is $150. For the 2007 lease extension, Ms. Bonnie's portion of that was roughly $2,000. At the time, regions was charging an 8% fee. 8% of $2,000 is, I think, $160, Your Honor. So, Ms. Bonnie testifies, I thought regions was taking money out of my account. I have no idea. In 2008, regions unquestionably takes out over a quarter of a million dollars, sends her a letter that says, this is the lease bonus associated with the 2008 PetroHawk lease. We negotiated as your agent at a time when she still didn't have a written agreement with contracts for herself with her own name. Regions says, we are your agent. We negotiated this for you. Give us over a quarter of a million dollars, which she happily gave them. The issue on causation is still an issue of acceptance. Regions never accepted the May 4th offer letter from PetroHawk, even if regions had accepted the May 4th offer letter from PetroHawk. At best, under Louisiana law, it's a contract to lease. And when people expect that there's going to be some other form of the contract, there's some other things that need to be done, that's not binding on them. This court has said that three, four times. We cite all of those cases in our brief, where this court says, that's not it. That's not binding. I'm out of time, Your Honor. Again, I'd this court would reverse. Thank you, counsel. Thanks. All right, the court will take this matter under advisement and we are adjourned until nine o'clock tomorrow morning.